J-A16002-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| KEVIN CHASE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LISA FLEMING | : | |
| | : | |
| Appellant | : | No. 75 MDA 2021 |

Appeal from the Order Entered December 29, 2020,
in the Court of Common Pleas of Columbia County,
Civil Division at No(s):  2020-CV0000525-CU.

BEFORE:   KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:              **FILED SEPTEMBER 29, 2021**

In this matter, Lisa Fleming (Mother) appeals the trial court order awarding shared physical custody of 11-month-old J.C. (Child) to Kevin Chase (Father), pursuant to the Child Custody Act. **See** 23 Pa.C.S.A. § 5328(a). Mother argues the court's decision was not supported by the record, primarily because Father was not equipped to parent their medically fragile baby.  After careful review, we affirm.

The record discloses the pertinent procedural and factual history as follows:  The parties briefly dated approximately 12 years ago, separated, and resumed their relationship a few years prior to Child's birth.  Mother became pregnant with Child in 2019, and during her 21st week ultrasound, she learned that Child would have significant medical issues.  The ultrasound revealed that

---

[*] Former Justice specially assigned to the Superior Court.

Child had a large arachnoid cyst on her brain, which was a fluid filled sac that prevented the brain from developing normally. *See* N.T., 12/4/20, at 77. Mother received extensive prenatal observation and eventually delivered Child seven weeks premature, in January 2020. *Id.* at 77-78.

After the birth, Child spent 30 days in the neonatal intensive care unit (NICU). As a result of the cyst, Child had hydrocephalus (a build-up of fluid in the brain), which would ultimately require three surgeries. *Id.* at 78. The neurosurgeons had wanted to wait several months before performing an operation, but surgery was deemed necessary a mere 13 days after Child was born. The doctors performed an endoscopic third ventriculostomy to drain the fluid in the cyst; however, there were complications during the surgery, and Child had to be resuscitated. Child also had a seizure post-surgery. *Id.* In May 2020, the 19-week-old Child had another brain surgery, this time at the base of her brain, to let the fluid flow out through her body. *Id.* at 79. Evidently, these surgeries were not successful at resolving the build-up of fluid, so in September 2020, Child had a third surgery to place a shunt in her head to allow the fluid to drain into her abdomen. *Id.* at 80.

Naturally, Child's condition required heightened care. Child received multiple MRIs and was prescribed twice-daily anti-seizure medication. Child received weekly physical and occupational therapy. *Id.* at 82. She also meets with a pediatric neuro-ophthalmologist, because the pressure from her brain has caused her optic nerves to be smaller than they should be, resulting in vision problems. *Id.* at 83. Child meets with a feeding team. *Id.* At the time

of the hearing, Child was developmentally delayed by approximately three to four months. *Id.* at 82. If Mother does not monitor Child's progress, Child will regress.

Meanwhile, Mother and Father had ended their relationship in March 2020 when Mother filed for protection under the Protection From Abuse (PFA) Act. (Mother had brought a petition for protection against Father in November 2019, while she was pregnant, but Mother withdrew that petition, hoping to keep the family together.) The court held a hearing on Mother's March 2020 petition in April, but Father did not attend the hearing. The court entered a final PFA order in April 2020.

Following the entry of the PFA order, co-parenting a baby with special needs was contentious. Initially, Father's custody time was reduced to supervised visits through Mother's family, although many of these visits were unsupervised anyway. Father filed a custody complaint in June 2020, and the parties proceeded through the normal course of custody litigation. The parties eventually agreed Father's visits would be officially unsupervised, but they continued to argue over the logistics of the visits and Child's medical care.[1] Father chose not to exercise his remaining visits, opting instead to wait until custody was resolved at the scheduled hearing. *See* Mother's Exhibit 2.

---

[1] Around this time, in late August 2020, Mother filed for contempt of the PFA order. Father explained that he was unaware of the same until he was contacted by the police around Thanksgiving, when they asked Father to turn himself in.

The court held a final hearing on December 4, 2020, during which Father represented himself. At the hearing, Mother explained why she opposed Father's request for shared custody.

Mother:

> I just want to tell the [c]ourt that [Child] has been through a lot. She's an 11-month-old baby. She's been through more than a lot of people in this short time. My concerns are that [Father] has not been a part of her life. He was only a part of her life face-to-face for the first three months of her life. Then again, he's seen her 12 times July through September. Now it's stopped.
>
> She has significant medical issues so my concerns have only been exacerbated by his lack of visitation with her and his lack of involvement in her medical care. And I just don't want her needs to be lost in this and I think that's important and I don't think that he can care for her in a healthy and safe manner unless there's supportive services that are in place.

Mother's Counsel:

> Do you believe that this is less about [Child's] needs and more about [Father's] want to win?

Mother:

> I believe that's how he feels, yes.

N.T. at 105-106.

The trial court issued its Findings of Fact and Conclusions of Law on the record on December 10, 2020, and awarded Father shared physical custody. The court entered its final order on December 29, 2020. Mother timely filed this instant appeal.

Mother presents one, rather generic issue for our review:

> Did the trial court abuse its discretion and commit an error of law when it awarded Father 50/50 shared physical custody when the trial court's factual determinations and its analysis of the custody factors under 23 Pa.C.S.A. § 5328 are not supported by competent evidence of record?

Mother's Brief at 14

We begin our review by observing our well-settled scope and standard of review for custody matters:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*S.T. v. R.W.*, 192 A.3d 1155, 1160 (Pa. Super. 2018) (citation omitted).

The Child Custody Act provides: "In ordering any form of custody, the court shall determine the best interests of the child by considering all relevant factors [(a)(1) through (a)(16)], giving weighted consideration to those factors which affect the safety of the child[.]" 23 Pa.C.S.A. § 5328(a)(1)-(16).

Mother's argument is that the trial court's decision was not supported by the record, in essence because the court based its decision on what the

- 5 -

court hoped would transpire, not upon what had actually occurred. ***See*** Mother's Brief at 31. Mother explains this argument best by citing certain findings. For instance, Section 5328(a)(3) inquires into "[t]he parental duties performed by each party on behalf of the child." The court found, in part:

> …Father is capable of being and performing the parental duties. The biggest issue is the Father needs to become informed of the special needs of their Child, this will require input from both medical professionals and also Father being proactive in getting the information. This factor favors the Mother in the short-term but the Father can equalize this factor out by being proactive and learning the needs of the child.

***See*** Findings of Fact, at 4-5.

In a similar vein, regarding Section 5328(a)(9)("Which party is more likely to attend to the daily physical, emotional, development, educational and special needs of the child.") the court found:

> …Mother has established this and Father is capable of establishing this. The only thing I state, again, is I encourage Father to be proactive in learning the special needs of the Child. Otherwise I do not find this factor to favor either party.

***See id.*** at 6.

Mother disputes these findings, arguing there was uncontroverted testimony that Mother would perform these daily tasks, whereas Father evinced an outright refusal to parent when he decided to forgo his unsupervised visitations pending the final custody hearing. ***See*** Mother's Brief

at 38.[2] Thus, it is self-evident that the court placed limited weight on the Mother's role as the primary caretaker during the seven-month interim period between the dissolution of her relationship with Father and the final custody hearing. According to Mother, although the court recognized that Mother had been the primary caregiver "partially due to the Protection From Abuse Order and also the dynamic of the relationship when the Mother and Father were together," (*see* Findings of Fact at 4), the court downplayed Father's abuse.

Concerning abuse, Section 5328(a)(2) inquires into: "The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child." On this point, the court stated:

> "[H]opefully this stuff is behind the parties but this does have a negative impact on the Child if it occurs going forward. Some of the allegations appear to be rash actions by the Father and in response to something – and I can't tell you what – what it would be in reaction to – the court at this point simply just encourages the Father to consider counseling that may help him address the underlying issues. ***There's something that seems to spark a reaction in regards to Mother.*** I think it's better if these issues are resolved by the Father and that they won't have an impact down the road on the Child.

Findings of Fact at 4 (emphasis added).

Mother argues this finding is indicative of the court's abuse of discretion. She reasons, not only did the court fail to see that Mother became the primary

---

[2] We note Father did not submit an Appellee Brief.

caretaker as a direct result of Father's abuse, but the court insinuated that Mother had somehow caused Father's abuse. *See* Mother's Brief at 37.

We understand Mother's arguments. Father's history of abuse, combined with Child's medical history, has certainly given us pause. But the question before us is not whether we would have ruled the same as the trial court, or even whether the trial court had sufficient evidence to rule in favor of Mother. The only issue on appeal is whether the record supports the trial court's decision. To that end, we observe:

> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) (citation omitted).

As we begin our review of the court's custody award, we emphasize that Mother's position is twofold: that Father was not fit to parent until Father could control his emotions and actions; and that Father should not be entitled to shared physical custody, because he could not adequately tend to Child's special needs. *See* Mother's Brief at 37-38; *see also*, *supra*, N.T. at 105-106. The court disagreed with Mother's position, and on appeal, we review whether those contrary findings are supported by the record evidence.

We start with Father's history of abuse. The court placed little weight on these allegations when analyzing the requisite custody factors. The court first heard testimony from Father's ex-paramour, Anna Welch, who is the

mother of Father's 14-year-old daughter, S.C.C. (This child is not the subject of these proceedings.)  Ms. Welch admitted to filing two PFA petitions against Father in 2008 and 2009, testifying that Father shoved her during an argument.  *Id.* at 11.  Still, she testified in support of Father: "[M]y relationship with [Father] has nothing to do with what kind of father he is.  I'm putting it out there.  The stuff that happened 14 years ago has nothing to do with the type of father he is now." *Id.*  In response to Father's question about whether he treated S.C.C. with disrespect or neglect, Ms. Welch testified, "When [S.C.C.] is bad she gets disciplined, other than that, no." *Id.* at 14. Father was also able to elicit testimony that when Ms. Welch brought PFA petitions against Father a decade earlier, Mother had come in support of Father.

The court also heard testimony from Mother's sister, Betsy Fleming, who supervised some of the visits between Father and Child.  She testified that Father was capable of taking good care of Child, and was loving, but that sometimes he needed instruction. *Id.* at 157-158.  While Ms. Fleming testified that Father was capable of parenting during the visitation, she shared in Mother's concern that Father would be able to care for Child full time during his shared custody. *Id.* at 159-160.  While Ms. Fleming described Father as volatile, she also conceded that when Father is amicable, he is a good parent. *Id.* at 165.  Mother too described Father as a loving parent when he was not being abusive. *Id.* at 109-110.  Mother also testified that Father was capable

of parenting S.C.C. when the teenager was a toddler, but naturally Mother distinguished the needs of S.C.C. from Child's special needs. *Id.* at 111.

To be sure, none of the testimony highlighted above excuses Father's abusive or inappropriate behavior. However, the testimony does support the court's determination that Father is capable of parenting when he can control his anger. Now that the parties' romantic relationship had ended, and now that the uncertainty of pending custody litigation had been resolved by a final order, the trial court determined that Father would be able to keep his emotions in check. And when Father kept his emotions in check, it was widely testified to that Father was a loving parent. As such, we cannot conclude that the court's decision to give Father's history of abuse limited weight, insofar as it relates to Child's best interests, was manifestly unreasonable. Consequently, appellate interference is unwarranted. *See A.V.*, *supra*. In reaching this conclusion, we are mindful that the trial court did not condone Father's previous hostility, that it encouraged Father to seek mental health therapy, and that it noted Father's behavior toward Mother needed to change. *See* Findings of Fact, at 4. Given our standard of review, we must conclude that the court acted within its discretion when it determined that it was in Child's best interest for Father have shared custody.

Next, Mother argues the trial court overlooked Child's special needs and Father's inability to tend to them on a shared custody basis. On appeal, Mother cites Father's decision to "flat-out refuse" to care for Child during the interim custody arrangement, and that Father was not prepared to address

Child's needs, which included twice-daily medication, monitoring for seizures motor-skill development, and various appointments with medical professionals. ***See generally*** Mother's Brief at 39-43. Mother's places great emphasis on Father's decision to forgo his visits for the three months leading up to the final custody hearing. But the trial court apparently was not persuaded by the same.

At the hearing, Father testified to the difficulty of coparenting after the parties separated. Father testified that when Child was born – at which point the parties were still together – Father visited Child every day in the NICU unless he had to work. Following their separation, and after the entry of the PFA order, Father explained that he had difficulty obtaining Child's up-to-date medical information. And that once he had access to the same, he had difficulty deciphering it without being there to ask the doctors questions. Although Father retained his status as a shared legal custodian, there was apparent confusion about whether Father had to be consulted before Mother consented to Child's medical care. Still, Father testified that he was amicable to the supervised visits, their locations and their tendency to change on short-notice. But eventually, the disagreements between Father, Mother, and Mother's family, who helped facilitate the visits, became more antagonistic. ***See generally*** N.T., at 34-45. Perhaps this was evidenced best by the fact that Mother filed for contempt of the April 2020 PFA order.

Although Father allegedly did not know about the contempt filing until November 2020, he had independently decided to wait until the trial court

rendered a final order, instead of partaking in further visitations. Importantly, it was Father's position that the "supervised" visits had essentially been unsupervised in practice. *See* Mother's Exhibit 2. In other words, Father did not feel the need to demonstrate his parental abilities more than he already had, prior to the final hearing.

On appeal, Mother's argues the court erred by not holding Father's forfeiture against him. We disagree. While it was within the court's purview to cast a negative inference from Father's decision to forgo his custody, pending the final hearing, it does not mean the court erred for failing to do so. Critically, the testimony revealed that Father was not wholly unable to care for the Child's special needs, as Mother contended. Father elicited Mother's testimony that she felt comfortable leaving Child in Father's care immediately after Child's third operation in September 2020, although Mother argued that hospital staff was available in case there was an issue. *Id.* at 123-124. Mother also conceded on cross-examination that the maternal grandmother and the maternal aunt, Ms. Fleming, also helped watch Child – the inference being that Child's needs are not so severe that Child cannot be handed off to another adult. *Id.* at 125-126. Father also argued he had been attentive to Child's needs when she was first born, and that he watched the parental training videos provided by the hospital staff, and naturally, that he had knowledge of Child's needs, having lived with Mother and Child during the first three months of Child's life prior to the parties' separation. *Id.* at 127.

All told, this was enough for the trial court to conclude that Father could tend to Child's special needs. We note that the court ordered Father to attend one of the child's physical therapy sessions and one of the child occupational sessions prior to beginning his shared custody. This provision seems more about getting Father up to speed after months of contentious communication between parents, and less about Child's safety. **See** Trial Court Opinion, 2/16/21, at \*2-3 (not paginated). The trial court reiterated that Father was capable of meeting Child's needs. **Id.** In our review, we conclude the record supports the court's determination about Father's parenting abilities.

To conclude, whatever reservation we might have about Child's medical fragility, based on the cold record, we must remember our role. It is for the trial court, not this Court, to assess the credibility and weight of the evidence – namely, how significant are Child's needs and whether Father can tend to them – and we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. **See S.T.**, 192 A.3d at 1160. Our interference is unwarranted, so long as the trial court's analysis of Child's best interest was careful and thorough. **See A.V.**, **supra.** Here, it was. The trial court properly considered all the relevant statutory factors under 23 Pa.C.S.A. § 5328(a). Although Mother argues that certain facts – and certain custody factors – should have carried more weight, she cannot cite to any specific legal authority supporting her position on appeal. In essence then, Mother only seeks to relitigate the custody hearing before this panel. Under such

circumstance, we will not substitute our judgment for that of the trial court.

*See S.T.*, 192 A.3d at 1160.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/29/2021